(COMMON LAW.)

## BEVERLY v. BROOKE.

Where the owner of certain slaves, and also part owner of a vessel, hired the slaves to the master of the vessel to proceed as mariners on board, on a voyage, at the usual wages, and without any special contract of hiring; held, that the master, having acted with good faith, was not responsible for the escape of the slaves in a foreign port, which was one of the contingent *termini* of the voyage, and, consequently, within the hazards to which the owner knew his property might be exposed; although it was doubtful whether the master had strictly pursued his orders in going to such port.

ERROR to the circuit court for the district of Columbia.

This suit was instituted by the plaintiff in the circuit court for the county of Alexandria, to recover the value of three slaves hired by the plaintiff to the defendant for a voyage to some part of Europe in the brig Sophila, of which the defendant was master, which slaves escaped from the vessel, and were lost to the owner. The claim was founded on the allegation that the master pursued a different voyage from that for which the slaves were hired, and that to this cause was to be ascribed the loss that had been sustained.

Feb. 11th.  The cause was argued by Mr. *Swann*, for the plaintiff, and by Mr. *Taylor*, for the defendant. The latter cited Pothier on Obligations, part 1, c. 2, art. 3,

to show that the party was only responsible for the ordinary results of his fault, unaccompanied with fraud,[a] and contended that the loss of the slaves was not a necessary consequence of the shipmaster's sup- posed misconduct, but was remote and unforeseen.

1817.<br>
Beverly<br>
v.<br>
Brooke.

Mr. Chief Justice Marshall delivered the opinion of the court.

Feb. 19th.

The declaration in this cause states, that the de- fendant " was master of the brig Sophila, then in the county of Alexandria, and bound on a voyage from thence to Savannah, in the state of Georgia, and from Savannah to New-York, in the state of New- York, and from thence to such other place or places as he, the said defendant, might be directed to go to by the owners of the said brig," of whom the plain- tiff was one. That believing and expecting the defendant would pursue the orders he should re- ceive, as was his duty, he hired to him, for the voy- age, the slaves in the declaration mentioned.

It appeared in evidence, that these slaves were received on board the vessel as mariners on the usual wages, and without any special contract.

---

_a._ So, also, the Napoleon Code, _liv._ 3. _tit._ 3. _Des Contrats et Obli- gations Conventionnelles._ "Le de- biteur n'est tenu que des domma- ges et intêrets qui ont été prevus ou qu'on a pu prévoir lors du con- trat, lorsque ce n'est point par son dol que l'obligation n'est point exécutée." _Art._ 1150. "Dans le cas même où l'inexécution de la convention résulte du dol du débiteur, les dommages et intérêts ne doivent comprendre, à l'égard de la perte éprouvée par le crean- cier et du gain dont il a été privé, que ce qui est une suite immé- diate et directe de l'inexecution de la convention." _Art._ 1151.

On the 23d of May, 1809, after the Sophila had sailed from Alexandria to Savannah, a letter of instructions was addressed to the master, which contains the following directions: "I hope this will find you arrived at Savannah, and ready to proceed on your voyage to Amsterdam, where you are to proceed with all despatch; and when you arrive off the Texel, should you not have received information, either from Messrs. Willinks, or from some source that you can depend upon, that you can enter Holland with safety, *you are to proceed to Tonningen, and from thence communicate with Messrs. Willinks, and follow their instructions.* If they say they cannot get you admitted to the continent, or can do nothing for you, you are then at liberty to take upon yourself the disposal of the cargo in any way that may be practicable, and the investment of the proceeds in any German goods that may answer our market. Should no opportunity offer for a sale at Tonningen, or on the coast of Holland, or Denmark, or in the Baltic, you must then, as a last resort, proceed to Liverpool," &c.

On the 6th of July, 1809, a letter, containing additional instructions, was written, of which the following is an extract: " Nothing decisive has yet occurred whereby to judge of the ultimate result of the pending negotiations between this country and the powers of the continent. But hoping, by the time you arrive in the British channel, all difficulties will be settled between us and the continent, your owners are still desirous, and direct, that you may prosecute your voyage, as before directed, for

1817.

Beverly
v.
Brookes.

Amsterdam. They are, however, desirous, that before you attempt to enter the Texel, you inform yourself whether the port be blockaded, and whether there be any danger of confiscation after entering. And should you not be able to get satisfactory information on these heads at sea, or going up the British channel, *you will proceed, as before directed, for Tonningen, and from thence communicate with Messrs. Willinks, of Amsterdam, and Messrs. Parish & Co., Hamburgh, and abide by their instructions. Should it so turn out that you cannot, with safety, proceed to Amsterdam, and that you can get admittance at Tonningen or Hamburgh, you will deliver your cargo at either place to Messrs Parish & Co. as they may instruct you,"* &c. "*If no admittance can be had either at Amsterdam, Hamburgh, or Tonningen, you are then at liberty to do the best you can with the cargo, as before directed.*"

Under these instructions the Sophila proceeded on her voyage, till visited by one of the squadron which blockaded Amsterdam. Information was there received showing the danger, from the local government, of entering the Texel, and also, that Hamburgh and Bremen were shut, and that Tonningen had been shut and opened to American vessels several times. The Sophila continued to ply off and on the mouth of the Texel for four or five days, with her signals displayed, when the master concluded to run into the Texel, the blockade of which, it would seem, was not then intended to exclude neutral commerce. In executing this design he was met by the schooner Enterprise, an American man

of war, beating out abreast the first buoy of the Hacks. The commander of the schooner sent his boat to the Sophila with a request that her master would come on board the Enterprise. The defendant went on board, and continued there near two hours. On his return, the commander of the Enterprise sent on board the Sophila a Captain Swaine, master of an American vessel which had been captured by a Danish cruizer on a voyage to St. Petersburg, and condemned. Captain Swaine gave to Captain Brooke, the defendant, a written statement, containing all the information he possessed respecting the dangers of those seas. He stated that his vessel was captured on the 4th, and condemned on the 19th of June. That on the 20th, himself and his men were turned on shore without assigning to them any cause of capture or condemnation, and without making any provision for them. His men were compelled to go on board Danish privateers to avoid starving. He remained himself at Albourg, until the 17th of July, when he travelled by land to Amsterdam, and passed within four miles of Tonningen. The information of Captain Swaine showed that the seas about the mouths of the Eider, the Elbe, and the Weser, swarmed with Danish privateers, who respected no flag, and brought in every American vessel they could capture. On the 28th of July he passed through Hamburgh, and waited on the American consul for a passport, where he was informed by the chancellor that there were several American vessels at Tonningen petitioning for liberty to land their cargoes, which they could

not obtain, nor was any attention paid to their petitions. He received the same information afterwards at Amsterdam. By the consulate at Hamburgh he was also informed that there had been, a few days before, some American vessels at Cruxhaven, which had been ordered by the consul to leave that place immediately. After receiving this information the Sophila proceeded to Liverpool, where the slaves of the plaintiff escaped, and have been totally lost.

Upon this testimony the counsel for the plaintiff prayed the court to instruct the jury, that if they believed the evidence, the plaintiff was entitled to recover of the defendant the value of the slaves in the declaration mentioned. The court refused to give this instruction, to which refusal the plaintiff excepted. A verdict was found for the defendant, and a judgment rendered thereon by the court; which judgment is now before this court on writ of error.

The plaintiff in error contends, that the circuit court ought to have given the instruction prayed for, because, 1st. The defendant has violated the instructions by which he was bound. 2d. Any violation of those instructions subjects him to every loss sustained in consequence thereof.

Captain Brooke is supposed to have violated his orders in not proceeding to Tonningen, and waiting there for the directions of Messrs. Willinks.

In considering the instructions given by the owners of the Sophila, there are extrinsic circumstances which ought not to be entirely overlooked. The state of the whole commercial world was with-

out example. The then emperor of France exer-
cised the most absolute despotism over nearly the
whole continent of Europe, and at his capricious
will destroyed the commerce and seized the proper-
ty of neutrals in the ports of those who were com-
pelled to submit to his influence. Under such cir-
cumstances it is reasonable to suppose that, in com-
mercial expeditions planned from so distant a place
as the United States, some confidence is placed in
the master of the voyage, and that much must be
left to his discretion. Although this consideration
will not excuse a disobedience of orders, it is enti-
tled to weight in expounding orders not entirely
decisive. The primary object of the owners was
obviously that the Sophila should go to Amsterdam.
Yet this primary object was to be relinquished, if
not to be attained with safety; and of this the mas-
ter was the judge.

But the orders are said to direct the master abso-
lutely to proceed to Tonningen should he decline
entering the Texel.

In the first letter of the 23d of May, this direc-
tion does appear to be positive, but it also appears
to have been given in the expectation that the voy-
age from the mouth of the Texel to Tonningen
might be prosecuted without imminent danger, and
with the probability of entering some port on the
continent. Of this probability the Messrs. Willinks
were to judge, should it be in the power of Captain
Brooke to consult them.

The first paragraph of the letter of the 6th of
July repeats the order to proceed to Tonningen,

should it be unsafe to enter the Texel, and there to communicate with Messrs. Willinks of Amsterdam, and Messrs. Parish & Co. of Hamburgh, and to follow their instructions." The letter then directs the conduct of the master, should he be enabled to get admittance into Tonningen or Hamburgh, and proceeds to say, "If no admittance can be had, either at Amsterdam, Tonningen, or Hamburgh, you are then at liberty to do the best you can with the cargo as before directed."

It is on this last clause in the letter that the difficulty arises.

The plaintiff contends that the master had no right to determine at the mouth of the Texel the practicability of getting into Tonningen or Hamburgh, but was bound to proceed for the former place, and when there, to govern himself by the directions of Messrs. Willinks, or of Messrs. Parish & Co. If this be not the true construction of the letter, he then contends, that the intelligence received off the mouth of the Texel did not excuse the master for sailing from that place for Liverpool.

As the first paragraph of that letter contains an unconditional order to proceed to Tonningen, should it be unsafe to go to Amsterdam, it is probable that the owners might found their subsequent orders on the state of things which might be found to exist when the vessel should arrive at Tonningen, and on the expectation that the voyage would be prosecuted to that place. But this expectation is not so clearly expressed as to be free from doubt. The writer does not say " it on arriving at Tonningen

no admittance can be had," &c.; but, "If no admittance can be had,"&c. These expressions might well be understood to apply to the fact, although it should be communicated before arriving at the place, and to dispense with the necessity of a useless voyage to Tonningen. There is the more reason for coming to this conclusion from the consideration that the vessel could not arrive at a place, admittance into which was forbidden. Whether this be the true construction of the letter or not, the phraseology is deemed too ambiguous to subject the master to remote damages, not certainly produced by his omitting to proceed to Tonningen, if, in omitting so to do, he acted with good faith and a sincere desire to obey his orders.

This brings us to the information under which he acted. That information was that Hamburgh was shut. That Tonningen had been occasionally shut, and occasionally opened, to American vessels. That, at the time, the cargoes of those which had been admitted, were not allowed to be sold; and that the voyage to Tonningen would be attended with very serious hazards, which were probably not contemplated by his owners when they gave their instructions. If, in such a state of things, the master should be thought to have misconstrued his instructions, and should be deemed responsible for exercising his own discretion, the action, founded on such misconstruction, would certainly be a harsh one. The court will not decide this question, because its decision is rendered unnecessary by the view taken of the second point.

2d. Admitting that the true construction of his orders required the master to proceed to Tonningen, on finding it unsafe to go to Amsterdam, is he liable in this action?

The court thinks he is not. No special contract is proved, and the slaves of the plaintiffs were put on board the vessel generally as seamen. The court is not satisfied that the danger of their escaping might not be as great on the continent as in England. But, at any rate, Liverpool was one of the contingent *termini* of the voyage, and was consequently within the hazards to which the plaintiff knew his property might be exposed. The danger of losing them, should the Sophila proceed to Liverpool, did not deter him from placing the slaves on board the vessel, nor from directing the master to go to Liverpool, or from giving full discretion respecting his port, in an event which was far from being improbable.

There is no error, and the judgment is to be affirmed, with costs.

Judgment affirmed.[b]

---

b It will be perceived that the above case was determined upon the ground that, whether the master misconstrued his orders or not, no special contract of hiring being proved, and the slaves being put on board generally as mariners, having escaped at a port which was one of the contingent *termini* of the voyage, and was, consequently, within the hazards to which the owner knew his property might be exposed, was not liable for the loss. In general, as to his obligations to the ship-owner, the master being a letter to hire of his care and attention, *conductor operis faciendi*, and the contract being reciprocally beneficial to both parties, *nothing more* is required of him than ordinary diligence; and he is only respon-

1817.

Beverly
v.
Brooke.

sible for ordinary neglect. But this must be understood, with the exception of his responsibility as a common carrier, and also that he is responsible like any other *conductor operis*, or even a manaatory, for a degree of skill in his profession adequate to the performance of what he undertakes.: *Imperitia culpæ adnumeratur. Straccha, de Nautis, Part* 3, *No.* 32. *Casaregis, Disc.* 23, *No.* 65, *Disc.* 122. *Nos.* 1. *and* 12. *Emerigon, tom.* 1. *p.* 373. These principles have been recognised by the tribunals of our own country. In the case of *Purviance et al. v. Angus,* the high court of errors and appeals of Pennsylvania said, "It is a wrong position that a master of a ship is not answerable for an error in judgment, but only for the fault of the heart, in civil matters. Reasonable care, attention, prudence, and fidelity, are expected from the master of a ship, and if any misfortune or mischief ensues from the want of them, either in himself or his mariners, he is responsible in a civil action." Per Chief Justice M'KEAN. 1 *Dall.* 184. But it is difficult, if not impossible, to lay down many general rules to enforce the performance, of all the duties of the master. *Targa* sarcastically remarks that it is as difficult to detect the misfeasance of ship masters as that of physicians. *Son questi errori. come quelli che commettono bene spesso i medici, nel curare li poveri infer-*

*mi. Ch.* 70. By the French *Code de Commerce,* it is provided that the responsibility of the master shall not be discharged but by proof of the intervention of the *vis major* or irresistible force. *La responsabilité du capitaine ne cesse pas que par la preuve d'obstacles de force majeure. Liv.* 2. *tit.* 4 *Du Capitaine, art.* 230. This provision may, at first sight, appear to extend unduty the responsibility of ship masters, which (except in their capacity of common carriers) ought not to be enlarged beyond that of other persons who undertake, for a reward, to perform any work. Its insertion in the Code was objected to upon this ground by the tribunal of commerce of Paimpol, who remarked that no ship master would be found willing to incur a responsibility so tremendous as that which a rigorous application of the literal expressions of the law might incur. That many accidents happen in navigation which no human skill can avert, but which are not to be considered as the effects of the *vis major,* and many misfortunes which are not to be attributed to the want of knowledge, the negligence, or the fault of the master. The tribunal, therefore, proposed, as an amendment to the article, the addition of the following words: *ou par l'effet des accidens qui tiennent au hasard et à l'imprévoyance insépable de la navigation et du chômage dans les ports.* But this

amendment was rejected upon the ground that it would be dangerous to insert in the code a general provision of this nature, which though it might be required in some cases, would, in others, be perverted to the protection of fraud and negligence, and the principle of which ought, therefore, to be applied by judicial discretion in every particular case, according to its own peculiar circumstances. *Esprit du Code de Commerce, var J. G. Locré, tom. 3. p. 101.*